52 N.J. Super. 350 (1958)
145 A.2d 504
PORT MURRAY DAIRY COMPANY, A CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
PROVIDENCE WASHINGTON INSURANCE COMPANY, A CORPORATION; THE ROYAL EXCHANGE ASSURANCE, A CORPORATION; THE HOME INSURANCE COMPANY, A CORPORATION; MARYLAND CASUALTY COMPANY, A CORPORATION; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., A CORPORATION; THE CONTINENTAL INSURANCE COMPANY, A CORPORATION; INSURANCE COMPANY OF NORTH AMERICA, A CORPORATION; DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided October 30, 1958.
*352 Messrs. Hannoch, Weinstein, Myers & Stern, attorneys for plaintiff.
Mr. Harold D. Feuerstein, attorney for defendants.
SULLIVAN, J.S.C.
This suit involves the construction of insurance policies issued to plaintiff by defendants and whether or not losses and expenses alleged to have been suffered or incurred by plaintiff were insured against or covered by these policies.
The situation has a factual background as follows. A number of dairy farmers in Pennsylvania, New York and New Jersey had organized a guild in order to collectively negotiate for a higher price for the milk which they sold to the dairies. When the dairies refused to have anything *353 to do with the guild, a milk strike was called. Plaintiff was one of the dairies affected by the so-called strike which commenced on February 24, 1957, and lasted until March 1 when it collapsed upon this court's issuing an injunction against the continuance of numerous acts of force, violence and intimidation.
During the strike the entrances and exits to plaintiff's plant were blocked off by a mob of approximately 50 men armed with clubs, cans of kerosene and spiked planks. These pickets prevented the movement of any milk either into or out of plaintiff's premises. Attempts were made to bring raw milk in and to ship the processed milk on hand out through the picket lines. The efforts were abandoned however when it became obvious that violence would result. There is no doubt but that the plant was effectively blockaded and nothing could be shipped in or out of it during the strike. Actually, the pickets did not damage or destroy any of plaintiff's plant or equipment. They simply prevented it from operating at all during the strike period.
As a result of the enforced shutdown of its plant, plaintiff claims that it suffered damages as follows. The milk and milk products which were in the plant at the commencement of the blockade, being perishable, deteriorated because of plaintiff's inability to ship it out. Much of it went bad and had to be dumped. When the strike ended, plaintiff salvaged some, by selling it locally for immediate consumption. The rest was disposed of at a loss for cheese manufacturing purposes, that being the only use to which it could be put due to its condition.
Another item of alleged damage resulted from plaintiff's efforts to maintain a milk supply to its distributors during the strike. Because its own plant was shut down by the blockade, plaintiff was obliged to purchase some outside milk and arrange to have this milk as well as some of the milk from its usual suppliers delivered to and processed by other dairies not affected by the strike. This effort to maintain normal business operations resulted in extra expense to plaintiff.
*354 Plaintiff's final claim stems from the inability of the local constabulary to provide adequate police protection. Deputies had to be hired to guard the plant during the strike and plaintiff was billed by the sheriff for the cost thereof. In addition, plaintiff joined with a number of other dairies in bringing court proceedings for injunctive relief and paid its share of the legal expenses.
As to all of these items of damage, cost and expense, it is plaintiff's contention that it is covered by insurance policies issued by defendants. Defendants, on the other hand say, that none of the policies issued to plaintiff extend coverage to the particular losses claimed.
At the trial it was agreed to limit the hearing in the first instance to the question of coverage or liability. In the event of a determination in favor of plaintiff, a further hearing would then be held on the quantum of plaintiff's recovery as well as the apportionment of liability among the several insurance carriers.
As to the alleged loss of, and damage to, the milk and milk products which were in the plant during the strike, plaintiff asserts coverage under a fire insurance policy issued by Insurance Company of North America for the contents of plaintiff's buildings. The policy contains two endorsements extending coverage to include specified perils, either one of which, according to plaintiff, entitles it to relief. The first endorsement is a "vandalism and malicious mischief endorsement" and extends coverage "to include direct loss caused by Vandalism and Malicious Mischief, being only wilful and malicious damage to or destruction of the described property." The mere reading of this endorsement indicates that the factual situation upon which plaintiff bases its claim for relief does not bring it within the limits of this endorsement. The acts complained of did not result in any direct loss nor did they constitute vandalism or malicious mischief as defined in the policy since there was no willful and malicious damage to or destruction of the property. This endorsement contains a specific provision that the insurer shall not be liable thereunder "for any loss from *355 depreciation, delay, deterioration or loss of market," thereby indicating that this type of damage was not to be considered the result of vandalism or malicious mischief within the meaning of the policy.
The other endorsement upon which plaintiff predicates its claim for relief is an extended coverage endorsement under which coverage of the policy is extended to include direct loss by "Windstorm, Hail, Explosion, Riot, Riot Attending A Strike, Civil Commotion, * * *." The endorsement contains a provision applicable only to riot, riot attending a strike and civil commotion which reads as follows:
"Loss by riot, riot attending a strike or civil commotion shall include direct loss by acts of striking employees of the owner or tenant(s) of the described building(s) while occupied by said striking employees and shall also include direct loss from pillage and looting occurring during and at the immediate place of a riot, riot attending a strike or civil commotion. Unless specifically endorsed hereon in writing this Company Shall Not Be Liable, however, for loss resulting from damage to or destruction of the described property, owing to change in temperature or interruption of operations resulting from riot or strike or occupancy by striking employees or civil commotion, whether or not such loss, due to change in temperature or interruption of operations, is covered by this policy as to other perils."
Again, the coverage extends only to direct loss by the perils insured against. The factual situation presented by plaintiff does not show any direct loss by riot, riot attending a strike or civil commotion. Further than that, the policy does not have specifically endorsed thereon in writing coverage for loss resulting from interruption of operations resulting from riot or strike as set forth in the non-liability clause (supra). This clause therefore applies precisely to plaintiff's situation. It is undisputed that the strikers or rioters did not damage or destroy the milk by direct physical contact. What happened was that they caused the interruption of plaintiff's business operations and it was that interruption which caused the milk to deteriorate. Plaintiff is not entitled to recover as to this loss.
*356 The second item of alleged damage for which plaintiff asserts insurance coverage is the extra expense it was put to, as heretofore detailed, in order to try and maintain normal business operations during the period of the strike. Insurance against this expense is claimed under eight policies of extra expense insurance, each one of the defendants having issued a separate extra expense policy to plaintiff. It has been stipulated however, that the policies are identical in language and, for the purpose of determining coverage, can be discussed as a single policy.
The extra expense policy consists of a standard fire insurance policy with an endorsement extending coverage to include vandalism and malicious mischief and also an extended coverage endorsement including windstorm, hail, explosion, riot, riot attending a strike, civil commotion, etc. There is attached to the policy an extra expense insurance form which is the heart of the policy. It must be kept in mind that while this is in form a fire insurance policy with the endorsements for additional coverage as stated above, actually the policy does not insure plaintiff's buildings or contents against loss by fire, vandalism, riot, and the like. What the policy does provide is that if there is any damage to or destruction of plaintiff's buildings or contents by any of the perils insured against (fire, vandalism, riot, and the like), the insurance company will pay the necessary extra expense incurred by the insured in order to continue the normal conduct of the insured's business during the period of restoration. Plaintiff argues that the contents of its buildings, namely, its milk and milk products, were damaged or destroyed by one or more of the perils insured against and that therefore the extra expense incurred by plaintiff in securing and processing other milk at another location is an insured against expense. This argument is fallacious. The reason plaintiff had to go elsewhere to continue business operations was not because of any damage to or destruction of its buildings or contents, but rather because the rioters had blockaded the plant. As a matter of fact, the milk and milk products on hand did not go bad immediately. *357 It was only after the lapse of some time that deterioration set in. The policy obviously refers to a situation where the insured's property, whether buildings or contents has been damaged or destroyed by an insured peril, and it is that damage or destruction that causes the extra expense incurred in order to continue normal operations during the period of restoration. The policy defines the period of restoration as that time interval required to repair, rebuild or replace such part of the above described property as has been destroyed or damaged. This language would be meaningless if we accept plaintiff's argument. In the situation presented by plaintiff there was no period of restoration at all for there was nothing to repair, rebuild or replace. Plaintiff could have obtained and processed milk at its only plant immediately had the rioters lifted the blockade.
Even if you accept plaintiff's argument that the damage to or destruction of the buildings' contents was the cause of the extra expense, it is clear that said damage or destruction was not caused by any of the perils insured against. The perils that plaintiff relies on are vandalism and malicious mischief, riot, riot attending a strike and civil commotion. The provisions in the extra expense policy regarding these perils and the exclusions thereunder are the same as were heretofore discussed in connection with the contents policy. Without going into detail, it is sufficient to observe that these same provisions regarding vandalism, riot and the like, have already been construed and held not to cover the factual situation upon which plaintiff bases its claim.
The last item for which plaintiff asserts coverage and seeks reimbursement involves the expenses incurred by plaintiff in obtaining deputies to protect plaintiff's property and the legal expenses paid by plaintiff to obtain injunctive relief. Plaintiff claims that the contents policy extends coverage to plaintiff for these expenses. The language relied on by the plaintiff consists of lines 12 through 24 of such policy and reads as follows:
"This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by:

*358 * * * * * * * *
(i) neglect of the insured to use all reasonable means to save and preserve the property at and after a loss * * *."
It is plaintiff's theory that the foregoing provision of the policy imposed a duty on it to minimize losses, and since it incurred expenses in so doing, such expenses are part of its loss recoverable under the policy. This argument attempts to read into the policy language that is not there. The clause in question is not an insuring clause at all. What it does do is impose an obligation on plaintiff to save and preserve the property at and after a loss. Failure of plaintiff to comply with this provision would result in its forfeiting its right to recover under the policy. This means just what it says. It would negate the clear language of the policy to convert this into an insuring clause obligating the Company for expenses which it did not undertake to pay. Further than this, it has already been determined that plaintiff suffered no insurable loss under this policy in the first place.
Plaintiff also suggests that coverage for these expenses might be found in the extra expense policy. It points to that part of paragraph 4 of the extra expense insurance form which provides as follows:
"* * * In no event, however, shall this Company be liable under this policy * * * for the cost of repairing or replacing any of the described property that has been damaged or destroyed by the perils insured against, except cost in excess of the normal cost of such repairs or replacements necessarily incurred for the purpose of reducing the total amount of Extra Expense."
This language cannot be construed so as to include plaintiff's expenses for deputies and legal services. The costs referred to are those excess costs of repairs and replacement that may be necessarily incurred. The clause just does not apply to plaintiff's expenses.
In considering all of the foregoing questions the court has recognized that whereever possible, insurance policies should be construed in favor of the policyholder or beneficiary. Insurance, however, is a matter of contract, *359 and in construing a policy, the court must determine the intent of the parties as expressed by the language employed. Where the meaning is clear the court must enforce the contract as it finds it. The policies in question, in so far as plaintiff's claims are concerned, are clear and unambiguous. The court has no power to read into them coverage that was not agreed to by the parties themselves.
Consideration has also been given to the testimony by plaintiff's witnesses that prior to the happening of the milk strike discussions were had with the agency representative of defendants' insurance companies concerning coverage under the policies in question in the event the farmers' guild should take action as threatened. It does appear that the parties discussed coverage in the event of interruption of operations and if plaintiff had to go elsewhere to continue operations. The agency representative, called by plaintiff as a witness, testified that in response to the inquiry made, he told Doctor Halprin, the president of plaintiff dairy, that he had issued all of the coverage available and that he assumed there was coverage for business interruption. He says however that no details of any kind were discussed. This evidence is not at odds with the construction placed on the policies by the court. The guild had been threatening the enforcing of its demands by force and violence. Doctor Halprin stated that it was these threats that caused him to make the inquiry about coverage. This was the kind of business interruption that the parties had in mind when the discussions were had. It is a fact that the plaintiff had coverage if its buildings or equipment had been damaged or destroyed by the rioters, compelling it to go elsewhere to continue business operations until the damage had been repaired. Even if this were not so the parties could not by informal oral discussion vary or modify the terms of a written contract.
Nothing has been shown to sustain the plaintiff's claim to insurance coverage as to any of the items of alleged loss, damage or expense. Judgment will be entered in favor of defendants.